**OPPENHEIMER & CO., INC.,**
**Plaintiff–Appellant,**

v.

**Ferdinand A. NEIDHARDT, and Erich Hoepfer, Defendants–Appellees,**

**Stephen Rothchild DeSimone, Defendant.**

**No. 821, Docket 94–7589.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 5, 1995.

Decided May 11, 1995.

Robert M. Abrahams, New York City (Hollis A. Bart, Lisa K. Buckser, Schulte Roth & Zabel, of counsel), for plaintiff-appellant.

Lawrence F. Ruggiero, New York City, for defendants-appellees.

Before: MAHONEY, LEVAL, and CALABRESI, Circuit Judges.

LEVAL, Circuit Judge:

This is an action brought by Oppenheimer & Co., Inc. ("Oppenheimer"), a broker and dealer in securities, seeking to stay an arbitration brought against it by alleged customers. Oppenheimer appeals from the orders of the United States District Court for the Southern District of New York, Sonia Sotomayor, *Judge.* The district court's order of December 30, 1993, denied Oppenheimer's motion to remand the proceeding to the New York state court, where it had been initiated. The order of May 4 and judgment of May 11, 1994, denied Oppenheimer's motion to stay the arbitration and granted claimants' cross motion to compel Oppenheimer to arbitrate. We affirm.

## BACKGROUND

On or about April 22, 1993, Oppenheimer was served by the National Association of Securities Dealers ("NASD") with an arbitration claim made by Ferdinand A. Neidhardt and Erich Hoepfer (the "Claimants"). The claim asserted in essence that Stephen DeSimone, a Vice President of Oppenheimer, travelled to Germany to solicit investments through Oppenheimer; that in response, Neidhardt and Hoepfer, German nationals, arranged with DeSimone to place substantial funds exceeding $3 million with Oppenheimer for investment [Hoepfer was acting as Neidhardt's trustee]; that DeSimone undertook to establish an account at Oppenheimer for Claimants' funds, which would be under their sole control, but that, pursuant to a fraudulent plan, DeSimone instead placed Claimants' funds into an account designated Euro–American Funding, Inc. ("EAF"), sub account No. I, under the control of Gerard Biemer and Frederick Herrling, who were fraudulent confederates of DeSimone; that, by various frauds and unauthorized transactions and diversions, DeSimone lost and/or stole the funds invested in the account and that Oppenheimer failed to return the funds to Claimants when demand was made.

Oppenheimer thereupon instituted this action in the Supreme Court of the State of New York seeking to stay the arbitration before the NASD. Oppenheimer contended that it had no obligation to arbitrate with the Claimants because they were not "customers" of Oppenheimer, and thus could not avail themselves of § 12(a) of the NASD Code of Arbitration Procedures ("NASD Code"), which requires Oppenheimer, as a member, to arbitrate any dispute with a "customer." (Oppenheimer's Verified Petition to Stay Arbitration, dated May 17, 1993).

Claimants removed the action to the United States District Court for the Southern District of New York on the basis of diversity of citizenship. Oppenheimer then moved in the district court to remand the action to the Supreme Court of the State of New York.

The motion was premised on various grounds, including that, because the Claimants instituted the demand for arbitration, they should be considered plaintiffs rather than defendants in the New York State court proceeding and, therefore, ineligible to remove under 28 U.S.C. § 1441(a). The district court, by order dated December 30, 1993, rejected Oppenheimer's theory and denied its motion for remand.

Oppenheimer then moved in the district court for a stay. The Claimants cross-moved to compel arbitration. On a schedule set by the district court, the parties made numerous submissions disputing the issue whether Claimants were customers of Oppenheimer and thus entitled under § 12(a) of the NASD Code to arbitrate against Oppenheimer.

The district court denied Oppenheimer's motion for a stay and granted the Claimants' motion to compel arbitration. The court then entered judgment in favor of the Claimants.

Oppenheimer brought this appeal challenging both the denial of its motion to remand to state court and the rejection of its position as to its obligation to arbitrate the claim. As alternative grounds, Oppenheimer contends that the district court should not have found the Claimants to be "customers" without first conducting a trial on that issue.

## DISCUSSION

### I. Removal of the arbitration dispute to federal court

Oppenheimer claims that the district court erred in permitting Neidhardt and Hoepfer to remove the stay proceeding to federal court. Removal was based on 28 U.S.C. § 1441(a), which provides that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed *by the defendant or the defendants*, to the district court...." (emphasis added).

Citing *International Tin Council v. Amalgamet, Inc.*, 645 F.Supp. 879 (S.D.N.Y.1986), Oppenheimer argues that, although it instituted the state court proceeding against Claimants, they were not defendants entitled to remove within the meaning of § 1441(a).

The argument is based on the theory that because the Claimants' demand for arbitration was the "mainspring" of the dispute, the Claimants were functionally the plaintiffs and Oppenheimer was the defendant. Accordingly, the argument proceeds, the plaintiff-Claimants could not remove under § 1441(a).

This argument is based on a misreading of Justice Holmes' opinion in *Mason City & Fort Dodge R.R. Co. v. Boynton*, 204 U.S. 570, 27 S.Ct. 321, 51 L.Ed. 629 (1907). That case involved a condemnation valuation under the laws of Iowa. Iowa's statute provided for valuation of the condemned land by a commission appointed by the sheriff, with the condemning corporation (in that case a railroad) or the landowner each having the right to appeal to the appropriate court of the state, which would then determine the value *de novo*. The Iowa statute went on to provide that in such a valuation appeal, regardless which party brought the appeal, "[t]he landowner shall be plaintiff and the corporation defendant." 204 U.S. at 571, 27 S.Ct. at 321. In the particular case, the landowner was aggrieved by the commission's valuation and appealed to the appropriate state court. As the landowner was a citizen of Missouri and the railroad of Iowa, the landowner-plaintiff claimed diversity and removed to the federal court, without opposition, and there won a more favorable valuation. The circuit court then certified to the Supreme Court the question, "Was the landowner a defendant within the meaning of the removal statute, when the suit was removed into the [federal] circuit court?" 204 U.S. at 574, 27 S.Ct. at 322. The Supreme Court answered the question, "Yes." The Supreme Court explained that "[t]he intent of the railroad to get the land is the mainspring of the proceedings.... The land is not lost until the owner is paid. Therefore, in a broad sense, the railroad is the plaintiff...." 204 U.S. at 580, 27 S.Ct. at 324. It followed that the landowner was "a defendant within the meaning of the removal statute," 204 U.S. at 574, 27 S.Ct. at 322, and authorized to remove the case from state to federal court.

The flaw in the reasoning of Oppenheimer (and of *International Tin*) is the inference that, because the landowner was authorized,

as a constructive defendant, to remove, the railroad would not also have been authorized to remove. This inference was expressly dispelled in the Supreme Court opinion. Justice Holmes cited two cases "in which it was held [in similar circumstances] that the railroad had a right to remove. *Myers v. Chicago & N.W.R. Co.*, 118 Iowa, 312, 324, 91 N.W. 1076. *See also Kirby v. Chicago & N.W.R. Co.*, 106 Fed. 551." 204 U.S. at 578–79, 27 S.Ct. at 323. Then, discussing the question whether granting the right of removal to the landowner, as defendant, implied that such right could not also belong to the railroad, as the Iowa court in *Myers* had held it might, Justice Holmes wrote, "It is not necessary, in order to decide that the present removal [by the landowner] was right, to say that the state decision [confirming the railroad's right to remove in identical circumstances] was wrong." 204 U.S. at 579, 27 S.Ct. at 323. In other words, *Mason City* establishes that, in some circumstances, the party identified as defendant, by reference either to state law definitions or to which party initiated the court proceeding, may not be the *only* one entitled to remove. In the unusual circumstance posed by that case, either side might be considered defendant and thus entitled to remove.

■ In recognition of the fact that, in the *initial* choice of forum, only plaintiffs have the opportunity to select the federal court, the statute conferring the right to remove on defendants is designed to allow defendants the same opportunity. In this manner, both sides have been offered the opportunity to select the federal court in cases within its original jurisdiction. To construe the removal statute as Oppenheimer suggests would deprive defendants, in some cases, of any opportunity to choose the federal court. Here, for example, it was Oppenheimer that initiated litigation by its petition to stay arbitration. It chose to do so in state court. It might have chosen federal court if it wished. The Claimants were involuntarily summoned into the jurisdiction of the state court; if

they nonetheless are to be deemed plaintiffs within the meaning of the removal statute, these foreign litigants have no chance to avail themselves of the protection of diversity jurisdiction. This construction would defeat the statutory purpose of giving each side the opportunity to require that a case within the original jurisdiction of the federal courts be tried there.

■ Thus *Victorias Milling Co. v. Hugo Neu Corp.*, 196 F.Supp. 64, 68 (S.D.N.Y. 1961), held that for purposes of removal of arbitration questions, the plaintiff is the party who first invokes the aid of a court. *See also Sears Roebuck & Co. v. Glenwal Co.*, 325 F.Supp. 86, 88 (S.D.N.Y.1970), *aff'd*, 442 F.2d 1350 (2d Cir.1971); *Old Dutch Farms, Inc. v. Milk Drivers & Dairy Employees Union Local 584*, 222 F.Supp. 125, 128 (E.D.N.Y. 1963). The district court, following the *Victorias* reasoning, ruled that "the removal privilege [may be invoked by] the party who had no choice in the initial selection of its forum in the state court proceeding." It therefore upheld the removal by the Claimants who were involuntarily summoned to state court. We agree. Whether this is the kind of circumstance, as in *Mason City*, that might justify giving either side the right to remove, we need not decide. The Claimants' exercise of the removal right was entirely proper, and nothing in *Mason City* suggests the contrary.

*II. Whether Neidhardt and Hoepfer were "customers" of Oppenheimer*

■ We are satisfied that the district court acted properly in denying Oppenheimer's motion to stay arbitration and granting the Claimants' cross-motion to compel Oppenheimer to arbitrate. Section 12(a) of the NASD Code sets forth the conditions under which an NASD member may be compelled to arbitrate.[1] It provides that, when a dispute arises between an NASD member and a "customer" in connection with the business of that member, the member is required to arbitrate if the customer so demands. It is

---

1. Section 12(a) provides:
   Any dispute, claim, or controversy ... between a customer and a member and/or associated person arising in connection with the business of such member or in connection with the activities of such associated person shall be arbitrated under this Code ... upon the demand of a customer.

undisputed that Oppenheimer is a member, that the dispute arises in connection with Oppenheimer's business as a member, and that the Claimants have demanded arbitration. The only disputed issue is whether the Claimants are customers of Oppenheimer.

The district court properly found that Claimants were customers of Oppenheimer, entitled to exercise the right to arbitrate their dispute under the NASD Code. The Claimants submitted evidence showing that Oppenheimer's representative DeSimone solicited Neidhardt to become a customer of Oppenheimer by placing funds with Oppenheimer for investment, that Neidhardt turned over his funds to Oppenheimer to be invested for Neidhardt's benefit under trustee Hoepfer's supervision, that Neidhardt alone was the beneficial owner, that Hoepfer was to have authority to instruct Oppenheimer concerning the investments to be made and for the return of the funds. Although the NASD Code offers no precise definition of "customer," the indicia established by the Claimants' evidence summarized above are sufficient to make the Claimants Oppenheimer's customers. Compare *Securities Investor Protection Corp. v. Morgan, Kennedy & Co., Inc.,* 533 F.2d 1314, 1318 (2d Cir.), *cert. denied,* 426 U.S. 936, 96 S.Ct. 2650, 49 L.Ed.2d 387 (1976), where the absence of indicia such as those here shown by Claimants led this court to hold that participants in a benefit plan were not customers of the broker through which the plan invested.

Oppenheimer asserts that the Claimants were not customers because the account holding their claimed funds was a corporate account, in the name EAF, showing Biemer and Herrling as the persons having authority. It asserts that the account was opened by Oppenheimer upon documentation presented by DeSimone showing only the interest of EAF, Biemer and Herrling. Oppenheimer asserts that the Claimants, even assuming they have an interest in the funds placed in the EAF account (like the plan beneficiaries in *Morgan, Kennedy*), are strangers to Oppenheimer. It never agreed to establish a customer relationship with them.

There are two major flaws in Oppenheimer's argument. First, it treats Oppenheimer's Vice President DeSimone as if he were a stranger, rather than one for whose acts Oppenheimer is responsible. In contending that Oppenheimer opened an account only for EAF and never dealt with the Claimants, Oppenheimer overlooks the critical fact that when Claimants dealt with DeSimone, they were dealing with Oppenheimer; DeSimone's acts were those of Oppenheimer. Second, Oppenheimer's diversion of the Claimants' funds into an account that did not reflect their status as customers was the very fraud of which they complain. Having turned over their funds to Oppenheimer's representative so as to become customers of Oppenheimer, the Claimants did not lose the legal benefits of customer status because Oppenheimer's representative fraudulently established their account in a manner designed to conceal and defeat their interest.

The evidence proffered by the Claimants, unless impeached or effectively countered, is sufficient to establish them as customers of Oppenheimer. Although Oppenheimer repeatedly uttered general denials of Claimants' contentions, it offered no evidence casting doubt on the accuracy of Claimants' evidence or on the inference from this evidence that they are customers. In response to the Claimants' factual submissions, Oppenheimer relied solely on its own account documents, asserting that because Claimants had no account agreement, and because the account agreement in question identified EAF as the customer and sole interested party, the Claimants' effort to establish customer status was conclusively defeated.

Indeed, DeSimone—who certainly might have raised a fact issue regarding the nature of his relationship with the Claimants (and thereby Oppenheimer's relationship with them as well)—has never denied the Claimants' allegations. Oppenheimer had access to DeSimone and might either have deposed him, or proffered his affidavit, to bring out any such disputes of fact. Had Oppenheimer offered evidence that it was the Claimants, rather than Oppenheimer's representative, who contrived to place their funds into the EAF account under the control of Biemer

and Herrling, this might have raised different considerations. But no such evidence was offered.

The district court was certainly correct in denying Oppenheimer's motion to stay. Oppenheimer's position was based on a flawed proposition and showed no entitlement to a stay.

■ Although the issue is slightly less clear, we are also persuaded that the district court acted properly in taking the next step of granting the Claimants' cross-motion to compel arbitration on the submitted papers. Oppenheimer contends the court should not have ruled on this issue without first holding trial to determine whether the Claimants were customers.

■ The Federal Arbitration Act provides for enforcement of arbitration agreements and directs in Section 4, 9 U.S.C. § 4, that "[i]f the making of the arbitration agreement ... be in issue, the [district] court shall proceed summarily to the trial thereof." Oppenheimer contends that the Claimants' status was "in issue," so that trial was required. However, to put such matters in issue, it is not sufficient for the party opposing arbitration to utter general denials of the facts on which the right to arbitration depends. If the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried. *See Manning v. Energy Conversion Devices, Inc.,* 833 F.2d 1096, 1103 (2d Cir. 1987) (where the application for an order compelling arbitration was supported by evidence of entitlement, "A party resisting arbitration on the ground that no agreement to arbitrate exists must submit sufficient evidentiary facts in support of this claim in order to precipitate the trial contemplated by 9 U.S.C. § 4."). *See also Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.,* 462 F.2d 673, 676 (2d Cir.1972). *Compare* Fed.R.Civ.P. 56(c), (e). As this court stated in *Manning,* "[a]rbitration is intended to be a process for the swift resolution of disputes, and parties endeavoring to resist arbitration must alert district courts promptly and finally to whatever claims they may have in opposition to arbitration and the evidentiary basis of such claims." *Manning,* 833 F.2d at 1103. Oppenheimer's evidence failed to meet the thrust of the Claimants' evidence. It failed to raise a genuine issue of fact for trial.

Nor can Oppenheimer claim unfair surprise that the district court ruled on the submissions without giving Oppenheimer the opportunity to advance contrary evidence. Both sides were seeking summary disposition. Oppenheimer had, from the outset, sought a summary ruling on its motion for a stay. Thus, its initial Order to Show Cause, filed in the state court, and its renewed motion for a stay (filed in federal court after denial of its motion to remand) were both supported by affidavits and exhibits offered to demonstrate entitlement to the stay without necessity of trial. Indeed, Oppenheimer argued to the district court that there was no need to hold trial because the Claimants had "failed to submit evidence sufficient to raise a fact issue." (Movant's Reply Mem. of Law in Supp. of Mot. for Stay of NASD Arbitration, ROA Doc. # 22, p. 2).

It was no surprise to Oppenheimer that the Claimants also were seeking a summary ruling on their cross-motion to compel arbitration, for the Claimants likewise submitted not only affidavits but also a Statement of Undisputed Material Facts, akin to a statement under Rule 3(g) of the Local Rules, U.S. District Courts for Southern and Eastern Districts of New York, seeking to establish entitlement to summary disposition on the basis of undisputed facts. Oppenheimer argued to the district court that it should not find Claimants to be customers without conducting a trial of the issue. (Movant's Mem. of Law in Supp. of Mot. for Stay of NASD Arbitration, ROA Doc. # 18, p. 23–24) Thus Oppenheimer had ample opportunity to proffer any evidence tending to contradict the Claimants' status as customers. Furthermore, Oppenheimer points to no facts it would offer at a trial, other than those already presented in its affidavits, which we have ruled insufficient.

Oppenheimer's last contention is that it "should have an opportunity to test the credibility of [the Claimants'] statements and to

have discovery of the other respondents. . . ." It made a similar argument to the district court. (ROA Doc. # 18, p. 24) However, Oppenheimer makes no contention that the district court deprived it of the opportunity to take whatever discovery it saw fit. Nor are we aware of any affidavits presented to the district court asserting that Oppenheimer was denied the chance to secure necessary discovery during the year the action was pending. There is no basis to conclude that the district court abused its discretion in ruling on the cross-motions as submitted.

## Conclusion

The judgment of the district court is affirmed.